*991 TEXTO COMPLETO DE LA SENTENCIA
El 18 de mayo de 1989, el Municipio de Barceloneta ("Municipio") y el C.P.A. José A. Maysonet Matrero ("Maysonet") firmaron un contrato por servicios profesionales pagándose los honorarios a base de una contingencia de un 20% de lo recobrado. Las funciones de Maysonet consistían en revisar y estudiar los documentos sometidos a éste para determinar la existencia, si alguna, de deficiencias en el pago de los arbitrios y las patentes municipales de ciertas compañías que se señalaban en dicho contrato acordado entre Maysonet y el Municipio. Además, el contrato permitía asignarle, por escrito, a Maysonet, el estudio de otras compañías que mantenían negocios dentro de los límites del Minicipio para que él determinara la existencia de deficiencias, si alguna, en el pago de la patente municipal o en los arbitrios.
A tenor con lo estipulado por las partes en el contrato, el mismo estaría en vigor hasta el 30 de abril de 1990. De acuerdo a la cláusula séptima del mismo, se entendería renovado por los años subsiguientes de no notificarse por escrito con treinta (30) días de antelación a la fecha de vencimiento su intención de cancelarlo por cualquiera de las partes. Por virtud de esta cláusula, el contrato fue renovado para los años 1991 al 1994.
El contrato regulaba el pago de honorarios contingentes al 20% de los cobros realizados por el Municipio atribuibles a los servicios prestados por Maysonet. A su vez, el contrato disponía que podía resolverse por cualquiera de las partes debiéndose notificar la fecha de resolución con sesenta días de anticipación. De ser ésta la situación, Maysonet tendría derecho a cobrar sus honorarios por las cantidades que se cobraron como resultado de sus servicios, aunque dichas cantidades se cobrasen con posterioridad a la fecha de la resolución del contrato. 
Para el 20 de julio de 1990, Maysonet trabajó en una investigación relacionada con posibles deficiencias en el pago de patentes o de impuestos sobre la construcción. Como resultado de este esfuerzo, el Municipio logró recaudar la cantidad de $277,091.19; o sea, unos centavos menos del 20% de lo recobrado por el Municipio.
El 12 de julio de 1991, las partes subscribieron un "Suplemento a Contrato de Servicios Profesionales" donde incorporaron las disposiciones de la nueva Ley 52 de 19 de diciembre de 1990, 21 L.P.R.A. see. 3201, et seq., ("Ley 52") que creían pertinentes. No obstante, se mantuvo inalterada la cláusula relacionada con los honorarios contingentes a razón de 20% de la cantidad recobrada por el Municipio, a pesar que la Ley 52 imponía un límite de 10% en los contratos contingentes.
La Oficina del Contralor realizo una auditoría de las operaciones del Municipio por el período correspondiente del 11 de septiembre de 1985 al 30 de junio de 1993 y rindió un informe de auditoría en el cual determinó que como resultado del contrato entre Maysonet y el Municipio, éste pudo recaudar una suma ascendentes a $3,257,227.91 correspondientes a las deficiencias determinadas por Maysonet, y que en dicho período, el Municipio le efectuó pagos contingentes a Maysonet ascendentes a $661,796.79 por dichos servicios.
Entre junio de 1991 a diciembre de 1993, el Municipio le efectuó pagos por $449,738.79 a Maysonet a base de un 20% de honorarios sobre las recaudaciones efectuadas sobre dicho período. La Oficina del Contralor indicó que dichos honorarios excedían la comisión de 10% establecida por la Ley 52 para la contratación de los servicios mencionados. O sea, según la Oficina del Contralor, se le debió pagar a Maysonet a base del 10% de lo recobrado ($224,868.80) y no a base de 20% de lo recobrado, como se hizo. También señaló que el 10 de septiembre de 1993, el Municipio y Bristol Myers formalizaron un acuerdo para el pago de patentes del mencionado *992 contribuyente por $51,762 para el 1993-94. Por dicho recobro, el Municipio le pagó de septiembre a diciembre de 1993 honorarios al 20% ($10,352.40) a Maysonet, a pesar de que el mismo correspondía a una patente del año corriente y no a una deficiencia. Por estas razones, la Oficina del Contralor recomendó al Municipio iniciar gestiones para recobrar de Maysonet la cantidad de $235,221.50, suma que representa el total de $224,868.80 más los $10,352.40.
El día 10 de mayo de 1994, el Municipio le sometió a la Oficina del Contralor sus contestaciones donde entendió que no había pagado en exceso a lo establecido por ley debido a que:

"Sostenemos que la Ley 52 aprobada el 19 de diciembre de 1990 no tuvo efecto de anular nuestro contrato con el Asesor (Maysonet), ya que, de haberlo hecho así, se hubiese violado la disposición constitucional que prohíbe el menoscabo de obligaciones contractuales."

Con fecha 1ro. de junio de 1995 y 29 de agosto de 1995, la Fiscal Auxiliar de la Oficina de Asuntos del Contralor del Departamento de Justicia, expresó que:

"Hemos concluido que el contrato del C.P.A. Maysonet con el Municipio de Barceloneta no fue afectado por la Ley 52 de 19 de diciembre de 1990 en su origen. No obstante, el hecho de que el contrato era renovable anualmente tiene el efecto de que se considerara un contrato nuevo por cada año, por lo que afectan los contratos del 1ro. de mayo de 1991 al 30 de abril de 1992 en adelante.

El Municipio debe instar acción civil en cobro de dinero para recobrar del licenciado Maysonet aquellas sumas pagadas a éste en exceso del 10% por concepto de comisiones por los contratos antes indicados.

El Municipio deberá cuantificar el total de exceso pagado al señor Maysonet por concepto de lo contratado desde el día 1ro. de mayo de 1991 en adelante y proceder a incoar acción legal en cobro de dinero por dicha suma sin dilación." 

A tenor con los incidentes en este caso, el Tribunal de Primera Instancia, Sala Superior de Bayamón, dictó Sentencia Parcial el 28 de octubre de 1998. La misma fue archivada en autos el 30 de noviembre de 1998 y obliga a Maysonet a la devolución de honorarios recibidos en exceso a lo autorizado por ley ($224,868.80 más $5,176.20).
Maysonet radicó, el 9 de diciembre de 1998, "Moción Solicitando Determinaciones de Hechos y Conclusiones de Derecho Adicionales", la cual fue declarada No Ha Lugar el 28 de diciembre de 1998, notificada y archivada en autos el 5 de febrero de 1999. Oportunamente, acude a este Tribunal y en su escrito de apelación señala como error que el Tribunal de Primera Instancia concluyó que el contrato de arrendamiento de servicios firmado por las partes era uno de vigencia determinada, que fue renovado anualmente y que cada renovación era un nuevo contrato a los cuales aplicaba la Ley 52.
I
Para la fecha en que las partes acordaron el contrato de servicios, estaba en vigor la Ley Núm. 146 de 14 de febrero de 1980 ("Ley 146"), mejor conocida como "La Ley Orgánica de los Municipios de Puerto Rico", 21 L.P. R.A. sec. 1101. El artículo 2.04 de la referida ley disponía que:

"El Municipio tendrá todos los poderes necesarios y convenientes para llevar a cabo todas las facultades correspondientes a un gobierno local y de aquellos incidentales y necesarios para el ejercicio de las siguientes funciones...:

7. Contratar los servicios profesionales y de consulta que fueran necesarios."

Bajo la Ley 146, se autorizaba al alcalde del Municipio contratar los servicios profesionales y consultivos *993 necesarios y convenientes para la realización de sus funciones, deberes y facultades conferidas. Esta legislación guardaba silencio en cuanto a los límites de pago por los servicios prestados mediante contratos con cláusulas de honorarios contingentes.
Posteriormente, se aprobó la Ley 52 que autorizaba a los Gobiernos Municipales establecer programas experimentales para contratar contingentemente asesoramiento en la identificación de casos de evasión, para la determinación de deficiencias y para el asesoramiento en el cobro de deudas, patentes, arbitrios, impuestos y derechos.
En lo pertinente, la Ley 52, en su artículo 5, establece lo siguiente:

"Se autoriza al Director de Finanzas, previa notificación por escrito del Alcalde, pagar a las personas contratadas al amparo de esta ley una comisión que en ningún momento excederá del diez (10) por ciento del total de la suma cobrada."

Además, la Ley 52, en el artículo 10, convalida aquellos contratos otorgados con antelación a esta ley referente a la prestación de servicios aquí autorizados y que cumplan sustancialmente con los requisitos dispuestos en la misma.
Establece, a su vez, en el artículo 11 que:
"Esta ley empezará a regir inmediatamente después de su aprobación y tendrá vigencia por tres (3) años naturales a partir de su aprobación."
Posteriormente, se aprobó la Ley Num. 81 de 30 de agosto de 1991, 21 L.P.R.A. see. 3201 et seq, ("Ley 81") conocida como "Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico" en la cual el legislador reconoce nuevamente la facultad de los municipios a contratar a base de honorarios contingents y sin establecer un límite.
La Ley 81 estableció, en lo pertinente, en su artículo 3.009 que:

"El Alcalde será la máxima autoridad de la Rama Ejecutiva del Gobierno Municipal y en tal calidad le corresponderá su dirección y administración y la fiscalización del funcionamiento del Municipio. El Alcalde tendrá los deberes y ejercerá las funciones y facultades siguientes:

(a) ...

(r) Contratar los servicios de profesionales, técnicos y consultivos necesarios y convenientes o útiles para la ejecución de sus funciones, deberes y facultades y para la gestión de los asuntos y actividades de competencia o jurisdicción municipal, incluyendo contratos contingentes." 21 L.P.R.A. see. 4109.
El término "Contrato Contingente" se define por la Ley 81, en su artículo 1.003 (1), como:
"Contratos contingentes" significará aquéllos en los que se provea para una obligación dependiente de los ingresos que se generen como resultado de la ejecución del contrato, incluyendo los que provean para un canon de arrendamiento basado en una cantidad fija o en el volumen de ventas y cualquier tipo de transacción económica que represente para el municipio un beneficio justo y razonable y cuya compensación dependa de los ingresos que se generen." 21 L.P.R.A. see. 4001(1).
Es importante señalar que la Ley 81, en su artículo 1.004, establece las normas de interpretación que rigen la ley:
*994 "Los poderes y facultades conferidos a los municipios por este subtítulo o cualquier otra ley, excepto disposición en contrario, se interpretarán liberalmente, en armonía con la buena práctica de la política publica fiscal y administrativa, deforma tal que propicie el desarrollo e implantación de la política pública enunciado en este subtítulo de garantizar a los municipios facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y el bienestar de los habitantes mismos." 21 L.P.R.A. see. 4002. 
En síntesis, podemos inferir que por medio de diferentes legislaciones se ha tratado de encaminar hacia un amplio poder decisional a los municipios en una política de autonomía, política que corresponde a la necesidad imperante de atender y brindar servicios inmediatos de los asuntos que afectan la vida de los ciudadanos de los distintos municipios. Para ello se ha tratado de otorgar a los gobiernos municipales los poderes y facultades que son esenciales para lograr el bien común de toda sociedad democrática descentralizando los poderes reservados del gobierno central.
II
Ante este panorama, procedemos aplicar los hechos de la controversia que se nos plantea. Básicamente, la controversia se resume en establecer, en primer lugar, si el contrato firmado por las partes fue renovado o si, por el contrario, el mismo era de término único.
En el contrato del 18 de mayo de 1989 entre Maysonet y el Municipio existe una cláusula que establece que estaría vigente- hasta el 30 de abril de 1990, por lo que el mismo tenía una vigencia. El contrato, a su vez, estipulaba que de no notificarse por escrito con treinta días de antelación a la fecha de vencimiento, se entendería renovado. Es de aplicación el artículo 1207 del Código Civil, 31 L.P.R.A. see. 3372 que dispone:

"Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral ni al orden público."

El Código Civil de Puerto Rico consagra el principio de la libertad de contratación. Art. 1207 del Código Civil, 31 L.P.R.A. see. 3372; C.N.A. Casualty de P.R. v. Torres Díaz, 141 D.P.R. _ (1996), 96 J.T.S. 85, a la pág. 1246. Es principio reiterado que "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". Art. 1233 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 3471; C.N.A. Casualty de P.R. v. Torres Díaz, supra, a la pág. 1246; J. Castán Tobeñas, Derecho Civil Español, Común y Foral, T. 3, 16ma. Ed., Reus, Madrid, 1992, a las págs. 691-692. Se estima por términos claros aquéllos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión, razonamiento o demostraciones susceptibles de impugnación. Sucn. Ramírez v. Tribunal Superior, 81 D.P.R. 357, 361 (1959). Concluimos, por tanto, que el contrato entre las partes era uno de año en año, renovable o no dependiendo de la voluntad de los contratantes.
Para el período comprendido para la vigencia del contrato entre el 18 de mayo de 1989 al 30 de abril de 1990, la Ley 146 regía las disposiciones del mismo, por lo que la partida de honorarios contingentes no tenía limitación, salvo una de razonabilidad, y podía estipularse a la voluntad de las partes en un 20%. Por tanto, las labores realizadas por el señor Maysonet en contemplación al contrato, no constituyeron una delegación ilegal de la autoridad de los funcionarios municipales; el contrato era válido por no contravenir con la Ley 146. 
Una vez el contrato es renovado y la Ley 52 entra en vigor, es decir, a partir del 19 de diciembre de 1990, afecta, prospectivamente, los contratos ulteriores a ser otorgados entre Maysonet y el Municipio. El efecto de la Ley 52 tiene que ser prospectivo, puesto que de lo contrario infligiría la cláusula de menoscabo de obligaciones contractuales de nuestra constitución, see. 7, artículo II. En igual forma, el artículo 3 del Código Civil, 31 L.P.R. A. see. 3, reconoce que:

"Las leyes no tendrán efecto retroactivo si no dispusieron expresamente lo contrario. En ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación."

*995 Posteriormente, se renovó, nuevamente, el contrato entre las partes el 1ro. de mayo de 1991, por lo que aplica la Ley 52, o sea, la cláusula que establece que los honorarios contingentes no serán en exceso al 10% del total de las sumas cobradas por el Municipio. Al no limitarse la cláusula de honorarios contingentes a un 10% según exigía la Ley 52, queda el contrato enmendado para cumplir con las disposiciones de la ley. Es en este período que el señor Maysonet cobró en exceso a lo establecido por la ley y le corresponde devolver al Municipio las cantidades cobradas en exceso, pero solamente por aquellos trabajos comenzados bajo el pacto en vigor entre 1ro. de mayo de 1991 y 30 de abril de 1992. Estos trabajos se deben compensar a base de un 10% de lo recobrado, aunque los mismos se cobrarán luego del 30 de abril de 1992.
Para los contratos otorgados en los períodos que cubren el 1ro. de mayo de 1992, 1993, 1994, entra el vigor la Ley 81. Esta ley, en su artículo 1.003, supra, establece el parámetro para los honorarios contingentes como uno que represente para el Municipio un beneficio justo y razonable. A pesar de que la Ley 52 no fue expresamente derogada, la misma era un programa experimental para que los municipios pudieran contratar los servicios profesionales basándose en el pago de honorarios contingentes limitados a un 10%. Por el contrario, la Ley 81 no estableció un límite máximo a pagar de honorarios contingentes, salvo razonabilidad, en la contratación de los servicios prestados; lo que hace es delegar las facultades para contratar lo necesario en el orden fiscal y administrativo. Por lo que forzoso es concluir que la Ley 81 desde su inicio (30 de agosto de 1991), le dio facultad a los municipios a contratar honorarios a base de un 20% de las sumas recobradas, eliminando las restricciones experimentales bajo la Ley 52.
Cuando existen estatutos que lucen estar en conflictos uno con el otro, le corresponde al tribunal interpretar las leyes que entran en juego de forma integral, armonizándolas y sopesando sus disposiciones para lograr el resultado más lógico y razonable posible. Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, (1992). Constituye un principio cardinal de hermenéutica el que la interpretación de una disposición específica de una ley requiere que se considere el estatuto en su totalidad, como parte de un todo coherente y armonioso. Zambrana Maldonado v. E.L.A., 129 D.P.R. 740, 749 (1992). La ley en cuestión debe ser examinada y comparada en sus partes, de modo que se hagan consistentes y surtan efecto. Id. A tales fines, deben interpretarse las distintas disposiciones o secciones del estatuto, las unas en relación con las otras. Id. Al examinar un estatuto, el juzgador está obligado a armonizar, en lo posible, todas las disposiciones del estatuto a los fines de lograr un resultado sensato, lógico y razonable. Col. Ing. Agrim. P.R. v. A.A.A., supra, a la pág. 756. Los estatutos deben ser interpretados y aplicados conforme al propósito social que los inspira, sin desvincularlos de la realidad y el problema humano que pretenden resolver. Id.; Pueblo v. Pizarro Solís, 129 D.P.R. 911, 918 (1992). Véase, además, García Pagan v. Shiley Caribbean, etc. 122 D.P.R. 193, 208-209 (1988).
Si existe un conflicto irreconciliable entre una nueva disposición y estatutos previos de igual rango referentes a la misma materia, la nueva disposición será la que controle o prevalezca, ya que constituye la última expresión de la legislatura. Díaz v. Srio. de Hacienda, 114 D.P.R. 865, 874 (1983); J.G. Sutherland, Statues and Statutory Construction, 3ra ed., Chicago, Callaghan Company, 1943, Vol. 2 Sec. 5201, a la pág. 532.
Los tribunales están bajo la obligación de desentrañar y hacer que prevalezca el propósito legislativo y deben evitar la interpretación del estatuto que pueda conducir a resultados irrazonables o absurdos; Díaz Marín v. Mun. de San Juan, 117 D.P.R. 334, 342 (1986); y cuando las leyes están en conflicto, es obligación fundamental imprimirle efectividad a la manifiesta intención legislativa, y se debe interpretar el estatuto de tal manera que prevalezca el objetivo del legislador sobre la disposición literal de aquella ley que esté en conflicto con la meta legislativa. Id. "La interpretación judicial debe propiciar la realización del verdadero propósito de la ley", Id., citando a E.R. Bemier, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Colegio de Abogados, 1963, Cap. XLVIII, a la pág. 230; Roig Comercial Bank v. Buscaglia, Tes., 74 D.P.R. 986, 997-998 (1953). "No debe prevalecer el lapso o la inadvertencia al legislar sobre la idea central que dio vida al estatuto"-, Díaz Marín, supra, a la pág. 343, citando Calaf v. See. Hacienda, 76 D.P.R. 577, 583 (1954). El tribunal apelativo está bajo la obligación fundamental de hacer cumplir la intención legislativa, aun hasta el punto de sustituir, alterar o eliminar judicialmente alguna frase específica estatutaria que, con diáfana claridad, haya sido incorporada a un estatuto por inadvertencia o error, hasta el punto de que esa frase derrote, obviamente, la intención legislativa que surja de la *996 totalidad de la ley. Roig Comercial Bank, supra, a las págs. 997-998. Véase, además, los artículos 17-19 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 17-19.
Ahora bien, como explicamos, la Ley 52 era aplicable al contrato entre Maysonet y el Municipio desde que estuvo en vigor el 1ro. de mayo de 1991 hasta el 30 de abril de 1992. Por tanto, a pesar de que dicho contrato tenía pactado el 20% como honorarios contingentes, dicha cláusula deberá rebajarse al 10% en cumplimiento de lo dispuesto en la Ley 52. En consecuencia, todo lo pagado a Maysonet por concepto de honorarios por recobros en casos comenzados durante la vigencia del contrato (1ro. de mayo de 1991 - 30 de abril de 1992), deberá limitarse al 10% de las sumas recobradas, aun cuando los recobros se hayan efectuados luego de expirada la fecha del contrato (30 de abril de 1992).
Para los contratos que fueron acordados luego del 30 de abril de 1992, los honorarios pactados a base de un 20% de lo recobrado son válidos.
III
Corresponde al señor Maysonet devolver la cantidad cobrada en exceso al 10% por el contrato que comprende el período del 1ro. de mayo de 1991 al 30 de abril de 1992, más los $5,176.20 que se le pagó por el cobro de patente corriente que debía la empresa "Brystol Myers”.
Por los fundamentos antes expuestos, se confirma en parte la Sentencia Parcial emitida por el Tribunal de Instancia y se devuelve el caso al Tribunal de Primera Instancia para los cálculos sobre honorarios que Maysonet deberá devolverle al Municipio y la emisión de una sentencia enmendada en conformidad con lo aquí expuesto.
Lo acuerda y manda el Tribunal y lo certifica la Subsecretaría General.
Gladys E. Ortega Ramírez
Subsecretaría General
ESCOLIOS 2001DTA 76
1. Como resultado de las gestiones comenzadas el 28 de septiembre de 1989 por Maysonet, el Municipio cobró la cantidad de $915,000.00 y se le pagó a Maysonet el 20% de dichas cantidades ascendentes a $183,000.00.
2. La Ley 52 tuvo vigencia desde la fecha de su aprobación, o sea, desde el 19 de diciembre de 1990.
3. La Oficina de Asuntos del Contralor del Departamento de Justicia correctamente acordó que lo contratado por Maysonet con anterioridad al 1ro. de mayo de 1991 no fue afectado por la Ley 52. Debemos añadir que es lógico entender que cualquier trabajo comenzado antes del 1ro. de mayo de 1991, aunque el mismo se terminara y se cobrara con posterioridad, estaba sujeto a los términos del contrato en vigor antes de esa fecha; o sea, que no podía afectarse la cláusula de honorarios que permitía cobrar a base de una contingencia de 20%, aun cuando el recobro se efectuara luego del 1ro. de mayo de 1991.
4. La Ley 52 caducó luego de tres (3) años; o sea, el 19 de diciembre de 1993. Luego de la vigencia de la Ley 81 (30 de agosto de 1991) y la fecha de caducidad de la Ley 52 (19 de diciembre de 1993), ambas leyes podían ser de aplicación al contrato, razón por lo cual se requiere la interpretación judicial.
5. La Ley de Municipios Autónomos representa la fuente legal de donde emanan los derechos y poderes conferidos a los municipios y la misma reconoció a éstos autonomía en el orden jurídico, económico y administrativo. Op. Sec. Just. Núm. 5 de 1993.
6. El mismo fue renovado automáticamente por tres (3) años subsiguientes: 1ro. de mayo 1991,1992, 1993 y 1994.
7. Esto comprende el período del 18 de mayo de 1989 al 30 de abril de 1990 y del 1ro. de mayo de 1990 al 30 de abril de 1991.
*997 8. Véase el artículo 1.004 de la Ley 81, anteriormente transcrito en esta Sentencia.
9. El contrato nunca fue enmendado para pactar honorarios contingentes al 10%.